The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer and the briefs on appeal. Both counsel waived oral argument before the Full Commission. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award. Accordingly, the Opinion and Award by Deputy Commissioner Kim L. Cramer is affirmed.
Following the hearing on October 12, 1994, the parties took the depositions of Hilda Deese, Dr. William Griffin, and Dr. Donald Goodman. After the submission of this additional evidence, defense counsel advised Deputy Commissioner Cramer that defendants would accept plaintiff's case as a lifetime case and were willing to enter a Form 26 and offer plaintiff a structured settlement. Plaintiff's counsel advised that plaintiff was not willing to accept the Form 26 or accept defendants' settlement proposal and requested that an Opinion and Award be entered. Subsequently, an Opinion and Award was entered in which Plaintiff's attorney was awarded an attorney's fee of 25% although his fee contract called for a fee of 33-1/3%. Defendants did not appeal; plaintiff appealed only the award of attorney's fees.
* * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on October 12, 1994 as:
STIPULATIONS
1. On December 1, 1987, plaintiff, was employed by Branch Banking Trust Company, employer, as a senior bank teller.
2. The parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. St. Paul Fire Marine Insurance Company was the workers compensation carrier for the employer.
4. On December 1, 1987, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant.
5. Plaintiff sustained injuries to her right knee, as a result of the fall on December 1, 1987.
6. On February 1, 1989, the North Carolina Industrial Commission approved a Form 21, Agreement for Compensation for Disability.
7. As reflected on the Form 21, on December 1, 1987, the average weekly wage of plaintiff was $288.40 and her weekly compensation rate was $192.28.
8. Plaintiff returned to work on December 2, 1987 and worked sporadically until August 22, 1988, which was her last day to work at Branch Banking Trust Co.
9. Plaintiff took a leave of absence on August 22, 1988, and was terminated from her employment on August 25, 1988, after being approved as disabled under the bank's long term disability program.
10. Long term disability benefits were paid to plaintiff at the rate of $708.00 per month until she began receiving Social Security benefits, when the long term disability payments were reduced to $340.00 per month. Plaintiff has received Social Security Disability benefits of $368.00 per month beginning February 1, 1989.
11. Defendants have paid plaintiff temporary total disability compensation of $384.56 for two weeks from May 17, 1988 through May 31, 1988, based on a compensation rate of $192.28 as shown on the Form 28B.
* * * * * * * *
The Full Commission adopts the Findings of Fact found by the Deputy Commissioner, as follows:
FINDINGS OF FACT
1. Plaintiff was born on October 25, 1944. She completed high school. Prior to working for defendant, plaintiff had worked as a teacher's aid for elementary grades, as a cashier at an Air Force Base Exchange, and as a bank teller at Sovran Bank and at Wachovia.
2. On December 1, 1987, plaintiff was working for defendant as a senior bank teller when she sustained her compensable injury by accident. As plaintiff was entering the vault to put away cash, she tripped and fell, landing on her right knee. This injury by accident was the subject of the Form 21 as set forth in the foregoing stipulations.
3. Following her injury by accident, plaintiff missed the following days from work: in December, 1987, 7 through 11, 21 through 24, 28 and 31 (11 days); January 25 through February 5, 1988, (12 days); March 11, 1988; April 25 and 26, 1988; half the day of May 16, 1988 and May 17 through 27, 1988 (9.5 days); half a day on June 17 and June 18 through 24, 1988 (7.5 days); and half of the day of August 12, 1988, for a total of 43.5 days, or 6 and 1.5/7ths weeks. Plaintiff has not worked in any gainful employment since August 22, 1988.
4. Following her injury by accident, plaintiff initially came under the care of her physician, Dr. Donald Goodman of Metrolina Family Physicians, whom she saw the next day. Dr. Goodman noted injury to her right knee and diagnosed a knee contusion and sprain. When he saw plaintiff on December 6, 1987, plaintiff complained not only of continued knee pain, but also of hip pain, which Dr. Goodman believed was associated with limping due to the knee. When plaintiff continued to experience pain and problems with her right knee, on December 18, 1987, Dr. Goodman put her in a knee immobilizer.
5. Dr. Goodman also referred plaintiff for evaluation by Dr. William Griffin at Mecklenburg Orthopaedic Associates, who saw plaintiff on December 10, 1987. Dr. Griffin found no evidence of a fracture or dislocation of the knee and diagnosed a sprain of the right knee.
6. Plaintiff was also seen by Dr. Lovejoy, Dr. Dunaway, and Dr. Morefield at Charlotte Orthopaedic Clinic. The x-ray as reviewed by Dr. Lovejoy showed either osteoporosis or a possible occult fracture. He suspected a post-traumatic chondromalacia of the knee, and suggested a bone scan to rule out an occult fracture. The bone scan was reviewed by Dr. Dunaway on March 24, 1988, and he concluded that plaintiff probably had a mild amount of chondromalacia. He noted that plaintiff seemed to be very depressed and he believed that a lot of her problems were emotional.
7. The physicians at Charlotte Orthopaedic Clinic also prescribed physical therapy. On April 12, 1988, when plaintiff was seen by Dr. Dunaway, he could not find any significant pathology with her knee. He noted that her Cybex evaluation showed inconsistent torque values generated by inconsistent efforts, indicating plaintiff may have given suboptimal efforts at rehabilitation. Injections of Kenalog and Xylocaine to plaintiff's right knee only gave her temporary relief.
8. Over the months following her accidental injury, plaintiff continued to experience pain and difficulty with her right knee, as well as increasing back pain. On June 16, 1988, when she saw Dr. Dunaway, plaintiff was very upset and crying. An arthrogram done on June 8, 1988 was negative, and there were no real objective findings to explain plaintiff's continued pain complaints. By this time, Dr. Dunaway believed much of her problem could be due to depression. Dr. Dunaway discussed his concerns with Dr. Goodman and on June 20, 1988, Dr. Goodman referred plaintiff for a psychiatric evaluation.
9. Plaintiff had a psychiatric evaluation at J Company Mental Health, where she was diagnosed with depression. Plaintiff continued to be seen in follow-up at J Company Mental Health.
10. As a result of her accident of December 1, 1987, plaintiff sustained injury to her knee, and subsequently developed chronic back pain. As a result of her ongoing knee pain and back pain, plaintiff became very depressed.
11. Due to her chronic pain and depression, plaintiff was hospitalized from April 14, 1989 until May 5, 1989. When she was initially admitted she was placed on suicide precautions and close observation. During her hospitalization, she was seen by Dr. Frank Highley, whose final diagnosis on discharge was adjustment disorder with mixed emotional features and somataform pain disorder. Following her discharge, Dr. Highley was on the opinion that her chronic pain syndrome rendered plaintiff disabled for the foreseeable future. He noted her depression remained overwhelming and was refractory to treatment.
12. As a result of her injury by accident, and the resulting chronic pain and depression, plaintiff has been and continues to be unable to earn wages in any gainful employment since August 23, 1988.
13. Due to her ongoing pain and depression, plaintiff may require ongoing medical and psychiatric treatment.
14. Although the carrier agreed to accept this as a lifetime case after the hearing and the taking of three depositions, the defense of this matter was not without a reasonable basis. The medical records and testimony show that the initial injury to plaintiff's knee did not appear to be so serious as to be disabling over a long period of time. The testimony of Dr. Griffin, as well as the medical records show that it was not clear that the back pain plaintiff experienced was causally related to her injury by accident. The medical records also contain indications that at times plaintiff may not always give her best effort and may exaggerate her pain, factors which bear on plaintiff's credibility. Ultimately, plaintiff's disability is based primarily on psychiatric factors, for which there are other contributing factors, although the depression developed after and was primarily caused by plaintiff's injury by accident. Viewing the plaintiff's medical assessments as a whole, the defendants had a reasonable basis to defend this claim.
15. Plaintiff entered a reimbursement agreement with Provident Life Accident Insurance Company dated July 27, 1989 under which plaintiff agreed to reimburse the company for any amounts she received as workers compensation benefits. This is a matter of private contract between plaintiff and Provident Life Accident Insurance Company,
16. On April 21, 1989, plaintiff entered a contingent fee contract with attorney Richard F. Harris, under which plaintiff agreed to a fee of 33 1/3% of any recovery or settlement, and 50% if any services were required after trial, such as an appeal or retrial. Attorney Harris has also submitted a fee statement showing hours and hourly rates for services rendered from 1989 through 1995. Using his hourly rates, the total fee incurred for the services of both Attorney Harris and his paralegal would be $24,502.
17. The services rendered by Attorney Harris on behalf of plaintiff were valuable and resulted in a decision in her favor. However, his services were not extraordinary, or unusual such that a fee of one-third which is in excess of the usual and customary fee charged by attorneys representing claimants before the North Carolina Industrial Commission, and approved by the Commission, would be justified. The one-third fee request is unreasonable and not justified in this case. In a case such as the present, a contingency fee of twenty-five percent of the plaintiff's recovery is generally approved for counsel. The Full Commission finds a fee of twenty-five percent to be reasonable and customary and appropriate for the services rendered by counsel. Twenty-five percent of the accrued compensation due plaintiff, payable as a portion of counsel's fee will generate approximately the amount Mr. Harris would have received had he charged his usual hourly fee. In addition, counsel will receive additional amounts as future compensation payments become due, which in all likelihood will exceed the fee that would have been received for services at an hourly rate.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. On December 1, 1987, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant when she fell at work, and subsequently developed knee pain, back pain and chronic pain syndrome and depression. G.S. § 97-2(6).
2. As a result of her injury by accident, plaintiff has incurred medical expenses for treatment rendered which was reasonably necessary to treat her condition and give relief, and defendants are responsible for payment for such treatment. Defendants shall also be responsible for all future medical treatment that may be necessary to provide plaintiff with ongoing relief. G.S. § 97-2(19); 97-25.
3. As a result of her compensable injury by accident, plaintiff has been totally disabled on the dates set forth in Finding of Fact Number 3 and since August 23, 1988, and is entitled to compensation at the rate of $192.28 per week for those intermittent dates and from August 23, 1988 and continuing so long as she remains disabled. G.S. § 97-29.
4. The contingency fee contract executed by plaintiff is not reasonable in view of the services rendered, and where a customary fee in such a case is twenty-five percent of the plaintiff's recovery. A fee of one-third of plaintiff's recovery would be excessive and unfair to plaintiff. Therefore, a fee of one-third of plaintiff's recovery will not be approved, while a fee of twenty-five percent of plaintiff's recovery, including future benefits is reasonable and appropriate compensation and will be approved for plaintiff's counsel. G.S. § 97-90.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
AWARD
1. A reasonable attorney's fee of twenty-five percent of the compensation awarded plaintiff by the 2 January 1997 Opinion and Award of Deputy Commissioner Kim L. Cramer is approved for plaintiff's counsel. Twenty-five percent of the compensation accrued and due plaintiff shall be paid to her counsel. Thereafter, every fourth compensation check due plaintiff shall be forwarded to her counsel.
2. Plaintiff's attorney shall pay the costs of this appeal and such attorney shall not pass any part of such costs on to his client.
 S/ __________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ __________________ J. HOWARD BUNN, JR. CHAIRMAN
S/ __________________ DIANNE C. SELLERS COMMISSIONER